UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| ASHIA GEORGE, individually and as personal representative of the estate of A.G., ELAJE GONZALEZ, and O.G.,<br><br>Plaintiffs<br><br>v.<br><br>ABBOTT LABORATORIES, INC.,<br><br>Defendant. | Civil Action No. 20-cv-2537 (EGS)<br><br>JUDGE EMMET G. SULLIVAN |

**DEFENDANT ABBOTT LABORATORIES, INC.'S
FED. R. CIV. P. 12(b)(6) MOTION TO DISMISS**

Pursuant to Fed. R. Civ. P. 12(b)(6), the Defendant, Abbott Laboratories, Inc., respectfully moves to dismiss the August 3, 2020 Complaint of Plaintiff Ashia George, individually and as personal representative of the estate of A.G., Elaje Gonzalez, and O.G. for failure to state a claim upon which relief can be granted. As shown herein, Plaintiffs' Complaint should be dismissed because it fails to satisfy the *Twombly/Iqbal* standard for stating a claim under the federal rules.

First, all claims based on an alleged failure to warn should be dismissed, because Plaintiffs fail to allege that there was any actionable failure to warn or that it caused any injury. Plaintiffs' claims are also barred by application of the "learned intermediary" doctrine, because the subject products were administered under the medical supervision of the decedent's doctors, with full knowledge of the products' characteristics and/or risks.

Second, all claims based on an alleged design defect should be dismissed, because Plaintiffs fail to allege that the subject products caused the infant's injury or are defective.  In addition, federal law preempts Plaintiffs' design defect claims.

Finally, Plaintiffs' other theories of liability fail because they are time barred (Wrongful Death), fail to state viable causes of action (Survival Act and "punitive damages"), are improperly duplicative of other defective allegations (breach of implied warranty), and because Plaintiffs otherwise fail to plead sufficient facts to support them (breach of express warranty, misrepresentation, negligent infliction of emotional distress, and all other theories previously mentioned herein).

For all of these reasons, as explained more particularly in the memorandum law submitted herewith, the Court should dismiss Plaintiffs' Complaint in its entirety for failing to state a plausible claim in accordance with the federal pleading standard.

Dated: September 17, 2020                                ABBOTT LABORATORIES, INC.


By: */s/ Matthew M. Saxon*
    Matthew M. Saxon
    msaxon@winston.com
    D.C. Bar No. 996157
    WINSTON & STRAWN LLP
    1901 L Street, N.W.
    Washington, D.C. 20036
    Tel: (202) 282-5627

    Stephen V. D'Amore (*pro hac vice* pending)
    Scott P. Glauberman (*pro hac vice* pending)
    Bryce A. Cooper (*pro hac vice* pending)
    Winston & Strawn LLP
    35 West Wacker Drive
    Chicago, IL 60601
    (312) 558-5600
    (312) 558-5700 (fax)
    Email: sdamore@winston.com
    Email: sglauberman@winston.com

Email: bcooper@winston.com

*Attorneys for Abbott Laboratories, Inc.*

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

ASHIA GEORGE, individually and as
personal representative of the estate of A.G.,

ELAJE GONZALEZ, and

O.G.,

                              Plaintiffs

        v.

ABBOTT LABORATORIES, INC.,

                              Defendant.

Civil Action No. 20-cv-2537 (EGS)

JUDGE EMMET G. SULLIVAN

**ABBOTT'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO DISMISS**

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 3

     A.    The Infant Formula Act ................................................................ 3

     B.    Abbott's formulas ........................................................................ 5

     C.    This lawsuit .................................................................................. 7

ARGUMENT ...................................................................................................... 8

    I.    All claims based on an alleged failure to warn should be dismissed. ..................... 8

       A.    Plaintiffs fail to allege that there was any actionable failure to warn or that it caused any injury. ......................................................................... 8

       B.    The learned intermediary doctrine bars the failure-to-warn claims. .......... 10

    II.    All claims based on an alleged design defect should be dismissed. ..................... 12

       A.    Plaintiffs fail to allege that Abbott's formulas caused the infant's injury or are defective. ......................................................................... 12

       B.    The Infant Formula Act preempts claims based on an alleged design defect. ..................................................................................... 14

    III.    The other theories of liability also fail to state a claim. ........................................ 17

       A.    The warranty claims should be dismissed. ................................................. 17

       B.    The misrepresentation claims should be dismissed. ................................... 18

       C.    The negligent infliction of emotional distress claim should be dismissed. .................................................................................... 19

       D.    The punitive damages cause of action should be dismissed. ..................... 19

    IV.    The wrongful death and survival action claims should be dismissed. .................. 19

       A.    These claims fail because the complaint's other claims fail. ..................... 19

       B.    Plaintiffs cannot sue under the Wrongful Death Act. ................................ 20

CONCLUSION .................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alcabasa v. Korean Air Lines,*
    1993 U.S. Dist. LEXIS 20918 (D.D.C.) ..............................................................20

*Anderson v. USAA Cas. Ins.,*
    221 F.R.D. 250 (D.D.C. 2004) .............................................................................19

*Asare v. LM-DC Hotel,*
    62 F. Supp. 3d 30 (D.D.C. 2014) .........................................................................19

*Aston v. Johnson & Johnson,*
    248 F. Supp. 3d 43 (D.D.C. 2017) ..............................................................8, 10, 15

*Bankers Std. Ins. v. All-Pro Servs.,*
    2020 WL 1695086 (D.D.C.) .................................................................................18

*Bell Atl. v. Twombly,*
    550 U.S. 544 (2007).............................................................................................12

*Casey v. Ward,*
    67 F. Supp. 3d 45 (D.D.C. 1983) .........................................................................20

*Destefano v. Children's Nat'l Med. Ctr.,*
    121 A.3d 59 (D.C. 2015) ......................................................................................19

*Dietz v. Smithkline Beecham,*
    598 F.3d 812 (11th Cir. 2010) .............................................................................11

*Dyson v. Winfield,*
    113 F. Supp. 2d 35 (D.D.C. 2000) .......................................................................11

*E. Penn Mfg. Co. v. Pineda,*
    578 A.2d 1113 (D.C. 1990) ...................................................................................8

*Greater Se. Cmty. Hosp. v. Williams,*
    482 A.2d 394 (D.C. 1984) ....................................................................................20

*Guidry v. Janssen Pharms.,*
    206 F. Supp. 3d 1187 (E.D. La. 2016)..................................................................15

*Hawkins v. Washington Metro. Area Transit Auth.,*
    311 F. Supp. 3d 94 (D.D.C. 2018) .......................................................................19

*Hull v. Eaton*,
    825 F.2d 448 (D.C. Cir. 1987) ...................................................................................13

*Jenkins v. Wash. Metro. Area Transit Auth.*,
    793 F. Supp. 2d 133 (D.D.C. 2011) ..........................................................................18

*Kubicki v. Medtronic*,
    293 F. Supp. 3d 129 (D.D.C. 2018) ..........................................................................19

*Marentette v. Abbott Labs.*,
    886 F.3d 112 (2d Cir. 2018) ......................................................................................15

*Moghaddam v. Pompeo*,
    424 F. Supp. 3d 104 (D.D.C. 2020) ............................................................................9

*Mut. Pharm. v. Bartlett*,
    570 U.S. 472 (2013) .............................................................................................14, 17

*Patteson v. AstraZeneca*,
    876 F. Supp. 2d 27 (D.D.C. 2012) .......................................................................10, 11

*Payne v. Soft Sheen Prods.*,
    486 A.2d 712 (D.C. 1985) ...................................................................................10, 18

*Quality Air Servs v. Milwaukee Valve*,
    671 F. Supp. 2d 36 (D.D.C. 2009) .............................................................................17

*Rollins v. Wackenhut Servs.*,
    802 F. Supp. 2d 111 (D.D.C. 2011) ..........................................................................13

*Romero v. ITW Food Equip. Grp.*,
    987 F. Supp. 2d 93 (D.D.C. 2013) .......................................................................13, 18

*Saunders v. Air Fla.*,
    558 F. Supp. 1233 (D.D.C. 1983) ..............................................................................20

*Utts v. Bristol-Myers Squibb*,
    226 F. Supp. 3d 166 (S.D.N.Y. 2016) .......................................................................15

*Wallace v. District of Columbia*,
    685 F. Supp. 2d 104 (D.D.C. 2010) ..........................................................................20

*Webster v. Pacesetter*,
    259 F. Supp. 2d 27 (D.D.C. 2003) .............................................................................13

*Witherspoon v. Philip Morris*,
    964 F. Supp. 455 (D.D.C. 1997) ..........................................................................17, 18

*Yates v. Ortho-McNeil-Janssen Pharms.*,
  808 F.3d 281 (6th Cir. 2015) .................................................................14, 15, 16

**Statutes**

21 U.S.C. § 350a ..........................................................................................3

21 U.S.C. § 350a(c)(1)(B) .............................................................................4

21 U.S.C. § 350a(c)(2) .................................................................................16

21 U.S.C. § 350a(c)(2)(B) .............................................................................4

21 U.S.C. § 350a(d)(1)(A) .............................................................................4

21 U.S.C. § 350a(d)(1)(B) .............................................................................4

21 U.S.C. § 350a(h) .....................................................................................4

D.C. Code § 12-101 ...............................................................................3, 19

D.C. Code § 16-2701 .........................................................................3, 19, 20

D.C. Code § 16-2702 ..................................................................................20

D.C. Code § 28:2-102 ..................................................................................17

D.C. Code § 28:2-105(1) ..............................................................................17

D.C. Code § 28:2-607(3)(a) ..........................................................................18

**Rules**

Fed. R. Civ. P. 9(b) .....................................................................................19

**Regulations**

21 C.F.R. § 106 .............................................................................................3

21 C.F.R. § 106.3 ...........................................................................................4

21 C.F.R. § 106.40(a) ..............................................................................3, 15

21 C.F.R. § 106.120 .....................................................................................16

21 C.F.R. § 106.120(a) ...................................................................................4

21 C.F.R. § 106.120(b)(6)(ii) ..........................................................................4

21 C.F.R. § 106.120(e) ...................................................................................4

21 C.F.R. § 106.120(f) ....................................................................................................4

21 C.F.R. § 107 ..............................................................................................................3

21 C.F.R. § 107.20(e) ....................................................................................................5

21 C.F.R. § 107.20(f) ...................................................................................................11

21 C.F.R. § 107.50(a) ...............................................................................................4, 16

21 C.F.R. § 107.50(b)(3) ..........................................................................................5, 15

21 C.F.R. § 107.50(d) ....................................................................................................5

21 C.F.R. § 107.50(d)(1) .............................................................................................16

21 C.F.R. § 107.50(d)(2)(i) ............................................................................................5

21 C.F.R. § 107.50(d)(2)(iii) .......................................................................................16

21 C.F.R. § 107.50(d)(3) ................................................................................................5

## Other Authorities

*Exempt Infant Formulas Marketed in the United States By Manufacturer and Category*,  www.fda.gov/food/infant-formula-guidance-documents-regulatory-information/exempt-infant-formulas-marketed-united-states-manufacturer-and-category ..............................................................................5

*How many infants are affected by or at risk of necrotizing enterocolitis (NEC)?*, www.nichd.nih.gov/health/topics/nec/conditioninfo/risk ........................................7

*Infant formulas*, National Institutes of Health, U.S. National Library of Medicine, www.medlineplus.gov/ency/article/002447.htm ......................................................3

Pub. L. No. 96-359, 94 Stat. 1190 ................................................................................3

Restatement (Third) of Torts: Product Liability § 15, cmt. a (1998)..............................8

## <u>INTRODUCTION</u>

The Abbott Laboratories companies have spent decades researching, developing, testing, and producing formulas that can be used by neonatology doctors to care for premature infants with low birth weights. The formulas help the infants overcome their unique feeding challenges, grow, and thrive. The first of Abbott's low-birth-weight formulas was Similac 24 LBW, released in 1978. It was followed two years later by Similac Special Care 24, the first formula for premature infants with low birth weights. Today, Abbott offers an extensive product line to help doctors support the nutritional needs of low-birth-weight and premature infants, including the Similac Special Care family of formulas and Similac Human Milk Fortifier. Under the direction and supervision of neonatal specialists, countless premature infants have benefited tremendously from those formulas.

The complaint in this case seeks to blame Abbott for the death of an infant who was born extraordinarily premature—at just 23 weeks, which is perilously close to the absolute minimum amount of gestation needed for viability. A month after she and her twin sister arrived in neonatal intensive care, their doctors fed them Similac Special Care, Similac Human Milk Fortifier, or both (the complaint does not specify). A month later, one infant developed a serious gastrointestinal infection to which premature infants are unfortunately prone. It is one of their leading causes of death. But rather than acknowledge that the Abbott formulas offered her a chance to grow after having been born so premature—her twin sister has survived to this day— the complaint blames the formulas for a problem resulting from the early birth itself.

Some of the complaint's causes of action are based on the assertion that Abbott failed to warn Plaintiffs (the infant's family members) that cow milk in the formulas increased the infant's risk of contracting the infection. But Abbott (a) warned about the possibility of "gastrointestinal complications," (b) instructed that the product could only be used under a doctor's direction and

supervision, and (c) cited studies explaining that human breast milk better protects against the infection. Plaintiffs do not identify any other warning that needed to be given, nor do they allege facts to show that any other warning would have saved the infant.

In addition, under the learned intermediary doctrine, Abbott is responsible for warning doctors, not patients or their family members. Plaintiffs never allege that doctors in a Neonatal Intensive Care Unit were unaware of the risk of this very common infection. In addition, the decision about whether and how to use specialized formulas for premature and extremely low-birth-weight infants is driven by a doctor's medical judgment, and Plaintiffs fail to allege that *any* additional or different warning would have affected the medical judgment of the doctors involved here. All claims based on a failure to warn should be dismissed.

Other claims in the complaint are based on the theory that using cow milk as an ingredient made the formulas defective in design. But the studies on which the complaint relies for that assertion say only that human breast milk may better protect against the infection—not that the formulas are defective or should not contain cow milk. Indeed, given that breast milk is often not available to premature infants (because the mother is unable to or chooses not to produce it, and donor milk is inaccessible), the complaint's attack on cow milk fails. Plaintiffs never allege facts to show that an available replacement ingredient would be equally effective.

All of Plaintiffs' claims that cow milk must be removed from the formulas are also preempted by the federal Infant Formula Act. Pursuant to the Act, Abbott's formulas underwent an extensive review by FDA, including a review to make sure their ingredients are "safe and suitable" and would not create "a health hazard." After that review, FDA allowed the formulas to be sold. Abbott may not replace cow milk as an ingredient without FDA's approval, so Plaintiffs' claims that state tort law now requires it to be removed may not proceed.

The complaint concludes with random causes of action that are obvious non-starters. Breach of express warranty and misrepresentation both fail because the complaint does not allege Abbott said anything misleading about the formulas. Breach of implied warranty improperly duplicates Plaintiffs' strict liability claims. Negligent infliction of emotional distress requires that Plaintiffs themselves be physically endangered by Abbott, but they were not. Punitive damages is not a cause of action. And the claims under the Wrongful Death Act (which were filed a year too late, by Plaintiffs who lack standing) and Survival Act fail because they are not based on any other viable cause of action. For these reasons and those stated below, the entire complaint should be dismissed.

## BACKGROUND

### A.    The Infant Formula Act

The federal Infant Formula Act of 1980 was enacted "to assure the safety and nutrition of infant formulas." Pub. L. No. 96-359, 94 Stat. 1190. Together with FDA's implementing regulations, the Act comprehensively regulates how infant formula is made, its contents and ingredients, and its labeling. 21 U.S.C. § 350a; 21 C.F.R. §§ 106–07. Several provisions of the Act and its regulations are important to this case.

*First*, infant formulas may contain only "substances that are safe and suitable for use in infant formula." 21 C.F.R. § 106.40(a). Neither the Act nor the regulations exclude cow milk as an ingredient. Indeed, with FDA's consent, many infant formulas for sale today include cow milk. *See* "Infant formulas," National Institutes of Health, U.S. National Library of Medicine, *available at* www.medlineplus.gov/ency/article/002447.htm.

*Second*, before any new infant formula is sold in the United States, its manufacturer must submit a notice to FDA that includes its "quantitative formulation"—how much of each ingredient it contains—as well as a statement of the "basis on which each ingredient" meets the

requirement of being safe and suitable. 21 U.S.C. § 350a(d)(1)(A); 21 C.F.R. § 106.120(a), (b)(6)(ii).

The manufacturer is prohibited by law from selling the formula until FDA has had 90 days to review the notice, during which time FDA must notify the manufacturer of any deficiencies, which would prevent the formula from being sold. 21 U.S.C. § 350a(c)(1)(B); 21 C.F.R. § 106.120(e). FDA may also require additional information and start a new 90-day review period. 21 C.F.R. §§ 106.120(e), (f).

These same FDA review procedures apply when a manufacturer makes a "major change" to an existing formula. 21 U.S.C. § 350a(c)(2)(B); 21 C.F.R. § 106.3. Major changes include "any reformulation," 21 U.S.C. § 350a(d)(1)(B), or "any new formulation ... or any change that causes an infant formula to differ fundamentally ... in composition from any previous formulation produced by the manufacturer." 21 C.F.R. § 106.3. A change that removes cow milk from infant formula is by definition by a major change because cow milk is a main ingredient of the formula.

For certain formulas that are used at the direction and under the supervision of a doctor, FDA has additional requirements. FDA conducts a special review of infant formulas, like Similac Special Care and Similac Human Milk Fortifier, "that are ... labeled for use by an infant who has ... low birth weight or who otherwise has an unusual medical or dietary problem." 21 U.S.C. § 350a(h); 21 C.F.R. § 107.50(a). For those formulas—known as "exempt" formulas because they may be exempted from certain requirements—the required 90-day notice must include "the label and other labeling of the infant formula, a complete quantitative formulation for the infant formula, and a detailed description of the medical conditions for which the infant

formula is represented." 21 C.F.R. § 107.50(b)(3). As with ordinary formulas, the regulations do not exclude cow milk as an ingredient, and some exempt formulas contain cow milk.

FDA has a statutory mandate to review the content and use of exempt infant formulas. The regulations twice state that FDA's Center for Food Safety and Applied Nutrition **must** review all of the information submitted about an exempt formula. 21 C.F.R. § 107.50(b)(3), (d). If as a result of that review the Center's Director "concludes that additional or modified … nutrient, or labeling requirements are needed, or that a product's exempt status is withdrawn," the Center must notify the manufacturer. 21 C.F.R. § 107.50(d)(2)(i); *see also* (d)(1), (d)(3). If the Director decides that the label must be changed or the formula may not be sold as exempt, and the manufacturer does not appeal, then the Director's decision "becomes a final agency decision"; if the manufacturer does appeal, then the FDA Commissioner makes the final agency decision. *Id*. § 107.50(d)(2)(i).

*Third*, the formula's label must include a "warning … that cautions against improper … use of an infant formula." 21 C.F.R. § 107.20(e). It must also include a "statement indicating that parents should consult their physicians about the use of infant formulas." *Id*. § 107.20(f). As explained below, Abbott's formulas have both of those warnings and more.

### B.    Abbott's formulas

FDA has authorized Abbott to sell exempt formulas, several of which are named Similac Special Care or Similac Human Milk Fortifier.[1] The complaint does not say which of those formulas are at issue in this case—in fact, it makes allegations about all of them (Compl. ¶ 15)— but they have similar ingredients and labeling.

---

[1] "Exempt Infant Formulas Marketed in the United States By Manufacturer and Category," *available at* www.fda.gov/food/infant-formula-guidance-documents-regulatory-information/exempt-infant-formulas-marketed-united-states-manufacturer-and-category.

As their product guides explain, supported by citations to scientific publications, the Similac Special Care formulas are used to feed "growing, low-birth-weight infants and premature infants." (Ex. 1 at 2, 4, 6, 8.)[2] Nonfat milk is identified as one of the ingredients. (*Id.* at 3, 5, 7, 9.) And the guides provide several prominent "**Safety Precautions**," including:

- "Very-low-birthweight infants are particularly susceptible to gastrointestinal complications; therefore, feeding should be initiated cautiously."

- "Spitting up, abdominal distension, abnormal stools or stool patterns, excessive gastric residuals, or other signs of intestinal dysfunction have been associated with enteral feeding [i.e., feeding in which food passes through the intestine] before the intestinal tract is ready to accommodate the regimen. At first signs of these problems, enteral feeding should be slowed or discontinued."

(*Id.* at 2, 4, 6, 8.) The product guides also caution to "Follow physician's instructions" (*id.*) and "Use under medical supervision" (*id.* at 3, 5, 7, 9), and the packaging warns, again prominently, to "USE AS DIRECTED BY A DOCTOR" (*id.* at 10-13).

Similac Human Milk Fortifier is "for premature and low-birth-weight infants as a nutritional supplement to add to human milk." (*Id.* at 15.) Nonfat milk is identified as one of the ingredients. (*Id.*) And the product provides several prominent "**Safety Precautions**," including:

- "Tolerance to enteral feedings should be confirmed by offering small volumes of unfortified human milk."

- "Powdered infant formulas are not sterile and should not be fed to premature infants or infants who have immune problems unless directed and supervised by your baby's doctor."

(*Id.*) The product guide cautions to "use under medical supervision." (*Id.*) The packaging prominently states to "USE AS DIRECTED BY A DOCTOR," and warns that "[p]owdered infant formulas are not sterile and should not be fed to premature infants or infants who might

---

[2] Exhibit 1 to this motion attaches clearer copies of the documents attached as Exhibit A to the Complaint.

have immune problems unless directed and supervised by a physician." (Similac Human Milk Fortifier Packaging, attached hereto as Ex. 2 at 2, 7, referenced at Compl. ¶¶ 15-16, 32, 51.)

### C.   This lawsuit

As background, a full-term pregnancy lasts 40 weeks, an infant born at 37 weeks is premature, and 23 weeks is a very early point in the range of viability. A single infant born after 23 weeks generally weighs just half a pound, and each individual twin usually weighs less than a single infant. There are around 9,000 cases of necrotizing enterocolitis (sometimes called NEC) per year in the United States, and it is one of the leading causes of death of premature infants.[3]

The complaint is 60 pages long, but it contains almost no information about the infant at its center. She is identified only as "A.G.," but a few paragraphs mention her name. (Compl. ¶¶ 26–27, 71, 75.) She and her twin sister "were born extremely prematurely with low birth weights and were the product of an approximate 23-week pregnancy." (*Id*. ¶ 9.) They were born on June 4, 2017 and moved to a Neonatal Intensive Care Unit. (*Id*. ¶¶ 5–6, 10.) There they were fed their mother's milk for a month, and then "Similac Human Milk Fortifier, and/or Similac Special Care" were added. (*Id*. ¶¶ 11–12, 14.) A.G. passed away around one month later from necrotizing enterocolitis, a gastrointestinal condition, but her sister survived. (*Id*. ¶¶ 3, 7, 25.) That is everything the complaint discloses about the infant.

Instead of alleging facts to support a cause of action, the complaint is preoccupied with citing studies and regurgitating lists of references cited in them. In all, the complaint includes more than ***300*** citations, taking up well over half of its length. (*Id*. pp. 10–47.)

---

[3] "How many infants are affected by or at risk of necrotizing enterocolitis (NEC)?," *available at* www.nichd.nih.gov/health/topics/nec/conditioninfo/risk.

As discussed below, the complaint's studies assert that human breast milk better protects than infant formula against necrotizing enterocolitis. According to one study, two of the major risk factors for necrotizing enterocolitis are being born before 32 weeks of gestation and weighing less than 1,500 grams at birth, the latter of which "drastically increases" the chance of having it. (Shulhan article at 81, attached hereto as Ex. 3, cited at Compl. ¶ 43.) The infant fell far under both of those marks.

Plaintiffs assert that Abbott's formulas are unreasonably dangerous to premature infants because they contain cow milk. (Compl. ¶¶ 20–23.) The complaint's counts are titled wrongful death, survival action, negligence (based on failure to warn), strict liability (based on design defect and failure to warn), negligence (same), misrepresentation, breach of warranty, punitive damages, and negligent infliction of emotional distress. Plaintiffs demand damages of over $10 million, plus punitive damages. (Compl. p. 60.)

## ARGUMENT

**I.    All claims based on an alleged failure to warn should be dismissed.**

    **A.    Plaintiffs fail to allege that there was any actionable failure to warn or that it caused any injury.**

To state a claim for failure to warn, a plaintiff must plead facts "affording a reasonable basis for the belief" that the defendant's "failure to provide adequate warnings was a substantial factor in bringing about the harm at issue." *Aston v. Johnson & Johnson*, 248 F. Supp. 3d 43, 53 (D.D.C. 2017) (citing *E. Penn Mfg. Co. v. Pineda*, 578 A.2d 1113, 1124 (D.C. 1990), and Restatement (Third) of Torts: Product Liability § 15, cmt. a (1998)). But the complaint does not. Abbott gave the substance of the warning Plaintiffs allege was required, and the complaint does not allege that any additional warning would have saved the infant.

Plaintiffs allege Abbott "failed to properly warn that its product, Similac Special Care and/or Similac Human Milk Fortifier, can significantly increase the risk that the premature infant will develop N.E.C. and/or death." (Compl. ¶ 24.) They admit that Abbott's product guides referred to scientific studies and medical literature, but they assert that "[n]one of this literature properly warns or highlights that its product causes N.E.C. or death nor provides guidance on how to avoid N.E.C. or death while using its product." (*Id*. ¶¶ 17–18).

The complaint's own allegations and exhibits[4] show that Plaintiffs are badly mischaracterizing Abbott's warnings and the literature they cite. The literature warns about the risk of necrotizing enterocolitis and the potential protective effect of human milk. One study reports: "human milk has several advantages over formula," including "protection against … necrotizing enterocolitis." (Klein article at 1418S, attached hereto as Ex. 4, cited at Compl. ¶ 17.) Another cautions: "Infants fed their own mother's milk have a lower risk of necrotizing enterocolitis." (Canadian Pediatric Society article at 1778, attached hereto as Ex. 5, cited at Compl. ¶ 17.) A third warns: "preterm infants fed their own mother's milk are reported to have less necrotizing enterocolitis … compared with formula-fed infants." (Chan article at 621, attached hereto as Ex. 6, cited at Compl. ¶ 17.)

Abbott also warned that "[v]ery low-birth-weight infants are particularly susceptible to gastrointestinal complications; therefore, feeding should be initiated cautiously." (Compl. ¶ 15.) Feedings should begin with small volumes and be progressively increased, but "slowed or discontinued" if an infant has signs of intestinal dysfunction such as abdominal distention or abnormal stools. (*Id*.) Together with the cited studies, these warnings describe conditions such as

---

[4] Given that the complaint itself cites and relies on the substance of these publications, this Court may of course consider them when ruling on a motion to dismiss. *Moghaddam v. Pompeo*, 424 F. Supp. 3d 104, 112 (D.D.C. 2020).

necrotizing enterocolitis and provide guidance on how to avoid them. Thus, Abbott already gave the substance of the warning that Plaintiffs claim was required.

Equally important, the complaint also fails to allege that different warnings would have saved the infant. It alleges that "[t]he mother … saw the Similac product containers and was aware that formula was being fed to her daughter." (Compl. ¶ 54.) But it *does not* contend she read, relied on, or was aware of any of the warnings or materials Abbott provided or cited, or that she would have ever been aware of additional warnings if Abbott had given them. The complaint therefore does not make factual allegations showing "how the alleged distinctions in the warnings would have had a causal effect," *Aston*, 248 F. Supp. 3d at 53, so the claims based on a supposed failure to warn should be dismissed.

### B.    The learned intermediary doctrine bars the failure-to-warn claims.

Plaintiffs allege that the "mother was never told that the formula could cause her baby to develop N.E.C. and death" or told about "the studies showing cow-based formula was extremely dangerous to her baby." (Compl. ¶¶ 55, 57.) But, under the learned intermediary doctrine, Abbott was not responsible for warning the mother.

The learned intermediary doctrine "alters the general rule that imposes liability on a manufacturer for failing to warn an end user of the known risks or hazards of its products." *Patteson v. AstraZeneca*, 876 F. Supp. 2d 27, 33 (D.D.C. 2012). Where the use of a product "was recommended by an intermediary who is a professional, the adequacy of the instructions must be judged in relationship to that professional." *Payne v. Soft Sheen Prods.*, 486 A.2d 712, 722 n.10 (D.C. 1985). In the medical context, the "rationale for the doctrine is that the treating physician is in a better position to warn the patient than the manufacturer" is, because the decision to administer medical products "involves professional assessment of medical risks in light of the physician's knowledge of a patient's particular need and susceptibilities." *Patteson*, 876. F.

Supp. 2d at 34 (quoting *Dietz v. Smithkline Beecham*, 598 F.3d 812, 815 (11th Cir. 2010)). The

doctor's role eliminates any need for the manufacturer to warn the patient. *Patteson*, 876 F.

Supp. 2d at 34.

The formulas' packaging and guides confirmed the need for a doctor to be involved in the

decision to use them. They state, "USE AS DIRECTED BY A DOCTOR" and "Follow

physician's instructions." (Ex. 1 at 10-13; Ex. 2 at 2, 7.) FDA's regulations require this warning.

21 C.F.R. § 107.20(f). Given that Abbott was responsible only for warning doctors, but the

failure-to-warn claims are based only on a failure to warn parents, those claims should be

dismissed.

As a second reason for dismissal, "the learned-intermediary doctrine also requires that the

inadequate warning be a 'producing cause' of the plaintiff's injuries." *Patteson*, 876. F. Supp. 2d

at 34. Without that, the "chain of causation … is severed." *Dyson v. Winfield*, 113 F. Supp. 2d

35, 41 (D.D.C. 2000). But the complaint never alleges that the doctors—in a Neonatal Intensive

Care Unit—were not already informed about the risk of necrotizing enterocolitis, which is one of

the leading causes of death among their patients. Nor does it allege that the warnings Abbott

gave and the studies Abbott cited were somehow insufficient to apprise them if they were

somehow not already informed, or that some additional warning would have changed their

treatment decisions or the information and recommendations they gave to the parents. The

complaint gives no reason to believe that any additional warning would have saved the infant, so

the failure-to-warn claims should be dismissed.

II.   **All claims based on an alleged design defect should be dismissed.**

A.   **Plaintiffs fail to allege that Abbott's formulas caused the infant's injury or are defective.**

The complaint asserts that formulas with cow milk are defective per se when given to any premature infant: "scientific data and well researched studies have concluded that the cow based product of the defendant carried unreasonable risks of N.E.C. and death, which far outweighed the product's benefits." (Compl. ¶ 78(b).) But none of the studies mentioned in the complaint actually draw that conclusion.

Instead, they report that necrotizing enterocolitis has many potential causes. "There are multiple factors that may contribute to NEC," of which "[p]rematurity is a predominant risk factor." (Shulhan article at 80-81, attached hereto as Ex. 3, cited at Compl. ¶ 43.) Prematurity brings with it a preterm gut, which facilitates the penetration by bacteria, and a premature immune system, which "cannot readily detect pathogens and protect against infections due to multiple associated factors." (*Id.* at 81.) It is a "culmination of these factors [that] increases a preterm infant's vulnerability to infections and disease, particularly NEC," making it a "multifactorial disease." (*Id.* at 81–82.)

When an injury has multiple potential causes, and it is only "possible" or "conceivable" that a defendant's alleged misconduct is responsible, that possibility cannot supply the required "plausible grounds to infer" liability, so the claims should be dismissed. *Bell Atl. v. Twombly*, 550 U.S. 544, 556, 570 (2007). That is especially true here, given the long history of FDA's review of formulas containing cow milk as a main ingredient, which is the background against which, under *Twombly,* Plaintiff's implausible allegations must be evaluated. *Id.*

Rather than showing that cow milk formulas, which have been used safely for decades, cause necrotizing enterocolitis, Plaintiffs' studies report that human breast milk appears to better

protect against it: "'The use of an exclusive HUM [Human] diet is associated with … decreased NEC rates.'" (Compl. ¶ 33.) At most, Plaintiffs' studies stand for the idea that human breast milk is preferred when it is "safe and available." (Hair article at 70, attached hereto as Ex. 7, cited at Compl. ¶ 41.) That has been known for decades and is discussed in the literature that is cited in Abbott's product guides. (*E.g.*, Barrett-Reis article at 581, attached hereto as Ex. 8, cited at Compl. ¶ 17.) But the reality is that human milk is not always safe and available, as Plaintiff's studies themselves acknowledge: "mothers of [very-low-birth-weight] infants often experience insufficient milk production." (Sisk article at Abstract, attached hereto as Ex. 9, cited at Compl. ¶ 33.)[5] Merely alleging that an alternative but often unavailable food may be superior does not state a claim that formulas are defective.

Given that formulas are often used when human breast milk is unavailable or insufficient, a claim that they are defective requires allegations showing that they could be replaced by an equally effective alternative design. *Rollins v. Wackenhut Servs.*, 802 F. Supp. 2d 111, 123 (D.D.C. 2011). If there is no realistic "manner of increasing the safety of the product," it cannot be considered defective in the first place. *Id.*; *see also Hull v. Eaton*, 825 F.2d 448, 454 (D.C. Cir. 1987) (a court must evaluate "if there was a feasible way to design a safer product," as well as "any new dangers created and any reduction in the benefits of the product caused by the safer design"); *Romero v. ITW Food Equip. Grp.*, 987 F. Supp. 2d 93, 108 (D.D.C. 2013) ("a plaintiff must identify the risks, costs and benefits of … alternative designs"); *Webster v. Pacesetter*, 259 F. Supp. 2d 27, 33–34 (D.D.C. 2003). But the complaint never suggests any way Abbott's

---

[5] For the sake of completeness, the other articles that Plaintiffs rely upon in their Complaint are attached as Exhibits 10, 11, and 12.

formulas could be improved. For that reason as well, all claims based the formulas' use of cow milk should be dismissed.

**B.     The Infant Formula Act preempts claims based on an alleged design defect.**

Plaintiffs' claims that assert a defect based on the presence of cow milk in the formulas also run afoul of the federal Infant Formula Act. The Act impliedly preempts such state-law claims because it would be "impossible for a private party to comply with both state and federal requirements." *Mut. Pharm. v. Bartlett*, 570 U.S. 472, 480 (2013).

*Bartlett* is instructive. The plaintiff there alleged a drug's design could cause a particular side effect. *Bartlett*, 570 U.S. at 477–78, 483. Avoiding that side effect would require changing the drug's design, but federal law prevented it, because the redesigned drug would be a new drug that would need to go through the FDA approval process. *Id*. at 483–84. The Supreme Court held that "state-law design-defect claims … that place a duty on manufacturers to render a drug safer by either altering its composition or altering its labeling are in conflict with federal laws that prohibit manufacturers from unilaterally altering drug composition or labeling." *Id.* at 490.

Similarly, in *Yates v. Ortho-McNeil-Janssen Pharms.*, 808 F.3d 281, 294 (6th Cir. 2015), the plaintiff alleged that a drug's manufacturer had a state-law duty "to change its formulation post-approval," by lowering the dose to make it safer. But the Sixth Circuit noted that under FDA regulations, once a drug is approved, the manufacturer may not independently make "any major changes" to its formulation. *Id*. at 298. The court explained the "impossibility" preemption issue as follows:

> [T]he question for "impossibility" is whether the private party could independently do under federal law what state law requires of it. [W]hen a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes.

14

*Id.* at 295 (internal quotations and citations omitted). Given that, any claim the manufacturer "should have altered the formulation [of the drug] after the FDA had approved" it was "clearly preempted." *Id.*[6]

The Second Circuit came to a similar conclusion in a case about Abbott's organic infant formula. It held that all state-law claims asserting that the formula improperly contained non-organic ingredients were preempted. USDA's agent had reviewed the ingredients and allowed the formula to be sold as organic, and that determination could not be reversed under state law. *Marentette v. Abbott Labs.*, 886 F.3d 112, 118 (2d Cir. 2018).

These same principles from the prescription drug and organic infant formula contexts lead to dismissal of all of Plaintiffs' claims that are based on the assertion that Abbott's formulas are defective in design because they contain cow milk. Those formulas went through FDA's special review process for exempt formulas. As part of that process, Abbott was required to submit—and FDA was required to review—detailed information such as the ingredients (including cow milk), labeling (including the warnings explained above), and "a detailed description of the medical conditions for which the infant formula is represented" (premature birth and low birth-weight). 21 C.F.R. § 107.50(b)(3). FDA's review necessarily included consideration of whether cow milk, as an ingredient, is "safe and suitable for use in infant formula." 21 C.F.R. § 106.40(a).

---

[6] *See also Aston,* 248 F. Supp. 3d at 54; *Utts v. Bristol-Myers Squibb*, 226 F. Supp. 3d 166, 186 (S.D.N.Y. 2016) ("The complaint's allegations of harm due to the design defect go to the nature of the composition of the drug" and "[t]he defendants had no ability to alter that composition without prior approval of the FDA"); *Guidry v. Janssen Pharms.*, 206 F. Supp. 3d 1187, 1206 (E.D. La. 2016) ("[T]o the extent the plaintiff contends that the defendants should have adopted a new design for Invokana *after* it was approved by the FDA, her defective design claim is preempted.").

The experts at FDA's Center for Food Safety and Applied Nutrition, including its Director, were then required to reach a conclusion about whether to add additional labeling requirements or withdraw the formula's exempt status. They knew Abbott was using cow milk in a formula for premature and low-weight infants, and they reviewed Abbott's labeling and warnings. If they had "determine[d] that a health hazard may exist," they would have withdrawn the formula's exempt status for infants with low birth-weight. 21 C.F.R. § 107.50(d)(1), (d)(2)(iii). Yet they concluded that Similac Special Care could be sold—as shown by the formula's place on FDA's list of exempt formulas—as a formula specifically designed for premature infants with "low birth weight," 21 C.F.R. § 107.50(a), like A.G.

In substance, Plaintiff's design-defect-based claims amount to nothing more than an assertion that Abbott must unilaterally and independently remove an ingredient—cow milk—and reformulate the product. In fact, the complaint is explicit about this, objecting that Abbott "did nothing to change" its "cow-based product." (Compl. ¶ 32.) But Abbott cannot make that unilateral change. Replacing cow milk—which is the leading ingredient in Similac Human Milk Fortifier, and the leading ingredient in Similac Special Care after water (Ex. 1 at 3, 5, 7, 9, 15)— would obviously be a major change and reformulation, which under the Act would make it a "new infant formula" requiring a new FDA review. 21 U.S.C. § 350a(c)(2); 21 C.F.R. § 106.120. Here, as in *Yates,* Abbott cannot satisfy the asserted state-law duties "without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency." *Yates*, 808 F.3d. at 295. Unilaterally changing the formula and selling it would violate the Act and its regulations. By insisting on that change in the name of state law,

16

Plaintiffs would make it impossible for Abbott to comply with federal law. For that reason, the state-law claim is preempted.[7]

## III.   The other theories of liability also fail to state a claim.

### A.   The warranty claims should be dismissed.

Plaintiffs' sole allegation of breach of warranty is this single conclusory statement: Abbott "expressly or impliedly breached its warranty that its product was safe to be fed to premature infants, when, in fact, it was extremely dangerous." (Compl. ¶ 87.) That allegation does not state a claim for breach under the Uniform Commercial Code, which governs the sale of goods such as the formula. D.C. Code §§ 28:2-102, 2-105(1).

The express warranty claim should be dismissed because it fails to allege Abbott "breached an express promise made about the product sold." *Quality Air Servs v. Milwaukee Valve*, 671 F. Supp. 2d 36, 46 (D.D.C. 2009) (citing *Witherspoon v. Philip Morris*, 964 F. Supp. 455, 464 (D.D.C. 1997)). The complaint identifies no breached promise at all, so the claim fails.

In addition, far from making any generic, blanket statement that the formulas are "safe to be fed to premature infants" (Compl. ¶ 87) in all circumstances, the product packaging stated that the formulas are for "USE AS DIRECTED BY A DOCTOR" (Ex. 1 at 10-13; Ex. 2 at 2, 7), and the product guides stated, "Follow physician's instructions" (Ex. 1 at 3, 5, 7, 9) and "Use under medical supervision" (*id.* at 15). They also warned that premature infants "are particularly susceptible to gastrointestinal complications" and therefore "feeding should be initiated cautiously" and "slowed or discontinued" "at first signs of these problems." (*Id.* at 2, 4, 6, 8.)

---

[7] Of course, Abbott could avoid this problem by deciding not to sell the formulas at all. But the Supreme Court has "reject[ed] this 'stop-selling' rationale as incompatible with our preemption jurisprudence." *Bartlett*, 570 U.S. at 488. "Indeed, if the option of ceasing to act defeated a claim of impossibility, impossibility pre-emption would be all but meaningless." *Id.*

Scientific publications cited in Abbott's product guides warn that human milk has advantages over any infant formula, including a protective effect against necrotizing enterocolitis. The complaint cannot state a cause of action for breach of express warranty by claiming Abbott made a statement that is nearly the opposite of what Abbott actually said.

The implied warranty claims should be dismissed because they improperly duplicate Plaintiffs' strict liability claim. "In the District of Columbia, 'the doctrines of implied warranty and strict liability in tort are but two labels for the same legal right and remedy'; under either theory, 'there is a liability imposed for injury caused by placing a defective product into the stream of commerce.'" *Romero*, 987 F. Supp. 2d at 100 (quoting *Payne v. Soft Sheen Prods.*, 486 A.2d 712, 720 (D.C. 1985)); *see also Bankers Std. Ins. v. All-Pro Servs.*, 2020 WL 1695086, at *5 (D.D.C.). Thus, "where a plaintiff alleges claims for both strict products liability and breach of implied warranties based on allegedly defective products against a party not in privity with the plaintiff, the implied warranty claims must be dismissed because the actions are the same." *Jenkins v. Wash. Metro. Area Transit Auth.*, 793 F. Supp. 2d 133, 152 (D.D.C. 2011). This Court should dismiss the implied warranty claims.

In addition, the complaint fails to allege that Plaintiffs gave Abbott the required pre-suit notice of breach of *any* warranty, on pain of being "barred from any remedy," D.C. Code § 28:2-607(3)(a)—and Abbott received no notice. That is another independent reason this Court should dismiss all of Count VII. *Witherspoon*, 964 F. Supp. at 464.

**B.    The misrepresentation claims should be dismissed.**

Like the express warranty claim, the misrepresentation claim does not rely on any specific statement by Abbott, instead asserting generically that Abbott somehow misrepresented its formulas as "safe and beneficial for premature infants." (Compl. ¶ 84.) It should be dismissed for the same reason as the express warranty claim.

In addition, Rule 9(b) applies to a misrepresentation claim, and as a result Plaintiffs were required to allege the "'who, what, when, where, and how' with respect to the circumstances of the fraud." *Anderson v. USAA Cas. Ins.*, 221 F.R.D. 250, 253 (D.D.C. 2004). The complaint pleads none of this. It does not specify any particular statements, identify a speaker, or state the time and place of any misrepresentation. *Id*. Under Rule 9(b)—or even as a matter of notice pleading—this Court should dismiss Count VI.

### C.     The negligent infliction of emotional distress claim should be dismissed.

A claim for negligent infliction of emotional distress requires allegations showing that the plaintiff, himself or herself, suffered a physical impact or feared one. *E.g.*, *Asare v. LM-DC Hotel*, 62 F. Supp. 3d 30, 34–35 (D.D.C. 2014). In other words, the plaintiff "must be 'physically endangered by the defendant's negligent activity.'" *Hawkins v. Washington Metro. Area Transit Auth.*, 311 F. Supp. 3d 94, 106–07 (D.D.C. 2018) (quoting *Destefano v. Children's Nat'l Med. Ctr.*, 121 A.3d 59, 69 (D.C. 2015)). But the complaint makes no allegation that Abbott physically endangered any Plaintiff. It alleges instead that the parents experienced grief and sorrow. (Compl. ¶¶ 93-94.) That alleged injury is outside the scope of the cause of action, so Count IX should be dismissed.

### D.     The punitive damages cause of action should be dismissed.

"[I]t is clear beyond cavil that the District of Columbia only recognizes punitive damages as a *remedy* [for certain causes of action] and not an independent cause of action." *Kubicki v. Medtronic*, 293 F. Supp. 3d 129, 193 (D.D.C. 2018). Count VIII should therefore be dismissed.

## IV.   The wrongful death and survival action claims should be dismissed.

### A.     These claims fail because the complaint's other claims fail.

Count I is based on the Wrongful Death Act, DC Code § 16-2701, and Count II is based on the Survival Act, *id*. § 12-101. These Acts "do not create substantive rights but rather provide

remedies for tortious conduct that results in death." *Wallace v. District of Columbia*, 685 F. Supp. 2d 104, 112–13 (D.D.C. 2010); *see also Greater Se. Cmty. Hosp. v. Williams*, 482 A.2d 394, 395 (D.C. 1984). Thus, if a complaint's other causes of action are dismissed, the wrongful death and survival causes of action must be dismissed. *Id*. As explained above, the complaint fails to state any claim, so Counts I and II should be dismissed.

> **B.   Plaintiffs cannot sue under the Wrongful Death Act.**

The Wrongful Death Act has a two-year statute of limitations, starting at the time of death. D.C. Code § 16-2702. A.G. passed away on August 2, 2017 (Compl. ¶ 7), and Plaintiffs did not sue until August 3, 2020. Thus, Count I is time-barred.

Even if Count I had been timely, the complaint fails to establish Plaintiffs' standing to sue. Section 16-2702 "makes clear that a cause of action 'shall be brought by and in the name of the personal representative of the deceased person.'" *Casey v. Ward*, 67 F. Supp. 3d 45, 50–51 (D.D.C. 1983). "The term 'personal representative,' as used in the Wrongful Death Act, is limited to officially appointed executors and administrators, and does not include parents of a decedent, when they do not serve in such an official capacity." *Id.* The complaint does not plead that any Plaintiff has been officially appointed to those roles, so this claim should be dismissed. *Alcabasa v. Korean Air Lines*, 1993 U.S. Dist. LEXIS 20918, at *7–8 (D.D.C.); *Saunders v. Air Fla.*, 558 F. Supp. 1233, 1235 (D.D.C. 1983).

### CONCLUSION

For the foregoing reasons, this Court should dismiss the entire complaint.

Dated: September 17, 2020 ABBOTT LABORATORIES, INC.


By: */s/ Matthew M. Saxon*
Matthew M. Saxon
msaxon@winston.com
D.C. Bar No. 996157

WINSTON & STRAWN LLP
1901 L Street, N.W.
Washington, D.C. 20036
Tel: (202) 282-5627

Stephen V. D'Amore (*pro hac vice* pending)
Scott P. Glauberman (*pro hac vice* pending)
Bryce A. Cooper (*pro hac vice* pending)
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600
(312) 558-5700 (fax)
Email: sdamore@winston.com
Email: sglauberman@winston.com
Email: bcooper@winston.com

*Attorneys for Abbott Laboratories, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2020, Defendant Abbott Laboratories, Inc.'s Motion to Dismiss was served by electronic mail on the following counsel for Plaintiffs and electronically filed with the Clerk of Court using CM/ECF, which will send notification of such filing to all registered participants.

Barry J. Nace                                 Stephen M. Reck
1025 Thomas Jefferson St., NW                 Levin, Rojas, Camassar & Reck, LLC
Suite 810                                     P.O. Box 431
Washington, DC 20007                          North Stonington, CT 06359
202-463-1999 - Telephone                      attorneyreck@yahoo.com
202-223-6824 - Facsimile
bjn@paulsonandnace.com


By:       /s/ *Matthew M. Saxon*
          Matthew M. Saxon
          DC Bar. No. 996157
          msaxon@winston.com
          WINSTON & STRAWN LLP
          1901 L Street, N.W.
          Washington, D.C. 20036
          Tel: (202) 282-5627

          *Attorney for Abbott Laboratories, Inc.*

22